IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

MICHAEL R. ALLEN, JR.                                              PLAINTIFF

v.                          NO. 3:16-cv-00166 PSH

NANCY A. BERRYHILL, Acting Commissioner                            DEFENDANT
of the Social Security Administration

MEMORANDUM OPINION AND ORDER

Plaintiff Michael R. Allen, Jr., ("Allen") began this case by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, he challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon the findings of an Administrative Law Judge ("ALJ").

Allen maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole and offers two reasons why.[1] Allen first maintains that he has mental/intellectual impairments that meet or equal Listings 12.04 and 12.05, and the ALJ erred when he failed to so find. Allen also maintains that his residual functional capacity was not properly assessed because his back pain prevents him from performing light work and his credibility was erroneously evaluated.

---

[1] The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

At step three of the sequential evaluation process, the ALJ is required to determine whether a claimant's impairments meet or equal a listed impairment. See Raney v. Barnhart, 396 F.3d 1007 (8th Cir. 2005). The determination is a medical determination, see Cockerham v. Sullivan, 895 F.2d 492 (8th Cir. 1990), and the claimant bears the burden of showing that his impairments meet or equal a listed impairment, see Pyland v. Apfel, 149 F.3d 873 (8th Cir. 1998).

Listing 12.04 encompasses affective disorders.[2] The required level of severity is met when the requirements of paragraphs A and B of Listing 12.04 are shown or when the requirements of paragraph C of Listing 12.04 are shown. Paragraph A requires proof of a depressive, manic, or bipolar syndrome. Paragraph B requires that the syndrome result in at least two of the following:

> (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.

Paragraph C requires a showing of a syndrome of at least two years' duration that has caused more than a minimal limitation of the ability to do basic work activities and one of the following:

---

[2] The ALJ evaluated Allen's mental/intellectual impairments pursuant to Listings 12.04 and 12.05 and found that the impairments do not meet or equal those listings. The ALJ's decision was issued on April 24, 2015. On January 17, 2017, revisions to the mental/intellectual listings formally took effect, including revisions to Listings 12.04 and 12.05. Because the ALJ's decision was issued before the effective date of the revisions, the Court will apply the versions of the listings in effect at the time of the ALJ's decision.

> (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Listing 12.05 addresses intellectual disabilities. The introductory paragraph of the listing provides that the disabilities encompass "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period," that is, the evidence demonstrates or supports onset of the impairment before the claimant's twenty-second birthday. A claimant meets or equals Listing 12.05 by satisfying the requirements of the introductory paragraph and one of four paragraphs contained in the listing. Paragraph A of the listing requires the showing of a mental incapacity evidenced by dependence upon others for personal needs and an inability to follow directions. Paragraph B requires a showing of a valid verbal, performance, or full scale IQ of fifty-nine or less. Paragraph C requires a showing of a valid verbal, performance, or full scale IQ of sixty through seventy and another impairment. Paragraph D requires a showing of a valid verbal, performance, or full scale IQ of sixty through seventy, resulting in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of an extended duration.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). As a part of making the assessment, the ALJ is required to evaluate the claimant's credibility regarding his subjective complaints. See Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001). The ALJ makes that evaluation by considering the medical evidence and evidence of the claimant's "daily activities; duration, frequency, and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions." See Id. at 1218 [citing Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984)].

A summary of the evidence reflects that Allen was seen at St. Bernards Medical Center ("St. Bernards") on five occasions between July of 2011 and February of 2014. See Transcript at 364-410. Although he was seen for various physical infirmities, the notes from the examinations reflect that he was routinely alert and oriented, had a normal thought pattern, and had a normal mood and affect. See Transcript at 371, 379, 404-405. The only time Allen presented to St. Bernards complaining of back pain was on February 20, 2014. The notes from that visit contain minimal findings. He was diagnosed with lumbago/low back pain, and it appears that he was seen for physical therapy. The notes also contains the following notation "REH: Able to Perform Home Exercise Prog." See Transcript at 365-367.

In December of 2013, Allen was seen by Dr. Suzanne Gibbard, Ph.D., ("Gibbard") for a mental status assessment and evaluation of his adaptive functioning. See Transcript at 297-301. She recorded that he reported the following information about his alleged disability:

> [Allen] said that he has an imaginary friend, someone who is [not] there, and he began seeing things and hearing things when he was doing drugs, Crystal, Marijuana, and Alcohol. He said that he has not done drugs or alcohol in ten years. He said that he still has the imaginary friend, named Fred, but [Allen] only sees him in his mind and he knows that he is not really there. He said that he had hallucinations when he was doing Crystal but that they have stopped now. He said that he had SSI Disability from 1999 until 2012. [Allen] said he was working about 24 hours, sometimes 32 hours, at Burger King from 2010 until 2012. He said that he worked as porter [and] janitor at Burger King. He said that his supervisors were happy with his work but that he missed too many days when his fiancee was ill and was fired but his supervisors said that he could have his job back.
>
> He said that he had learning problems, problems with comprehending, reading, and spelling.
>
> [Allen] said that his mood goes up and down and he gets frustrated.
>
> [He] endorsed symptoms of severe depression which are: not enjoying things the way that he used to and sleep problems.

See Transcript at 297. Gibbard recorded Allen's history of psychiatric treatment to include the following:

> … Allen reported a history of inpatient treatment for mental health symptoms when he was 36 because he was suicidal and was there for forty-eight hours and then again at the age of 38 until 40 at a mental health facility in Wisconsin due to hallucinations and aggressive behavior and was prescribed Seraquel, Zyprexa, and Remeron.

> ... Allen reported a history of outpatient treatment for mental health symptoms, court ordered for Anger Management for 38 weeks ... also in New Hampshire, but unclear of details.
>
> ... Allen reported financial circumstances prevent him from seeking mental health treatment.

<u>See</u> Transcript at 298. Allen reported no difficulty in his activities of daily living, activities that included driving, shopping, handling his finances, bathing and dressing, and helping with household chores. He reported completing the eleventh grade in school but was in special education classes. Gibbard observed that Allen's mood was largely normal, although his affect fluctuated and his thought process was somewhat slow. She diagnosed borderline intellectual functioning. With respect to the effects of the impairment on his adaptive functioning, she found, in part, the following:

> [Allen's] communication skills are within an adequate range, ...
>
> He has the capacity to cope with mental cognitive work demands but they would need to be relatively simple and routine.
>
> Some problems were noted with ... Allen's ability to sustain concentration in the area of Digits Backward.
>
> He may have problems with the capacity to sustain completion of tasks and completing them in a timely manner unless they are relatively simple and routine.
>
> ... Allen appeared to be cooperative during the evaluation and there was no evidence of exaggeration or malingering. There was no evidence of approximate answers or atypical symptom.

<u>See</u> Transcript at 300.

In December of 2013, Allen was seen by Dr. Roger Troxel, M.D., ("Troxel") for a general physical examination. See Transcript at 302-306. Troxel found that Allen's range of motion was within normal limits, he had negative straight-leg raises, and his gait and coordination were within normal limits. Troxel observed that Allen could stand/walk without an assistive device but could not walk on heel and toes or squat/arise from a squatting position. Troxel repeatedly noted in his notes that he believed Allen was malingering. Troxel observed that Allen was oriented to time, person, and place, and Troxell observed no evidence of psychosis. Troxel diagnosed, in part, lumbar spondylosis, a learning disorder, dyslexia, and a multiple personality disorder. Troxel opined that Allen had no significantly decreased ability to, inter alia, walk, stand, sit, lift, or carry.

On January 30, 2014, Allen presented to Mid-South Health Systems ("Mid-South") complaining of a variety of mental problems. See Transcript at 309-313. Robin Guile, ("Guile") a licensed professional counselor, recorded Allen's presenting problems to be as follows:

> [Allen] is a 51 year old male, self referred. He is a previous client with a prior diagnosis of POSTTRAUMATIC STRESS DISORDER; DEPRESSIVE DISORDER, NOS; BORDERLINE AND ANTISOCIAL PERSONALITY TRAITS; and BORDERLINE INTELLECTUAL FUNCTIONING per Dr. Hashmi in 2007. [Allen] presented today stating his fiancé died a year ago and since that time he has "gone downhill." He stated he talks to himself all the time, has an imaginary friend named Fred, sees flying dragons, and has mood swings. He complains mostly of depression, difficulty sleeping, and low energy. He is living with his parents and cannot find work. He lost his social security but is reapplying. He has not been on any medication in six years. He denied any substance abuse.

See Transcript at 309. [Emphasis in original]. Allen reported that in 1990, he "threw himself out of [a] building and tried to hang himself." See Transcript at 309. He denied any current thoughts, plans, or intentions of harming himself. He reported that he completed the eleventh grade in school but can only read at a sixth grade level. He also reported that he had not taken medication for his mental impairment in the past six years. He lives with his parents and relies upon them for his support. Guile observed that Allen was casually dressed but a bit unkept, his speech was clear, his thought process was logical, his affect was full range and appropriate, and his mood was pleasant. She diagnosed, inter alia, an "unspecified episodic mood disorder," borderline intellectual functioning, and anti-social/borderline personality traits. He agreed to participate in individual therapy on a regular basis and expressed an interest in "possibly re-starting medication." See Transcript at 312.

    Allen attended counseling sessions with Guile from what appears to have been February of 2014 through November of 2014. See Transcript at 419-445. The progress notes from the sessions reflect that Allen's mood was typically pleasant and stable, his thought process was logical, and his communication skills were adequate. He nevertheless experienced some "ups and downs." See Transcript at 440. For instance, the progress note from September 10, 2014, reflects that after becoming frustrated with his father, Allen isolated in his room for three days. See Transcript at 434. Guile encouraged Allen to engage in "at least [one] activity that is productive and helps him ventilate frustration." See Transcript at 434.

Allen was seen at the AHEC Family Practice Clinic on several occasions between January of 2014 and October of 2014. See Transcript at 342-361. Although the progress notes from the visits offer little insight into his mental/intellectual impairments, the notes do reflect that he complained of back pain on several occasions. For instance, on January 27, 2014, he presented complaining of low back pain. It was noted that he had sustained a "traumatic fall requiring surgery in 2001." See Transcript at 355. He did well for a "long time" but "recently started hurting again for about 1 ½ years now." See Transcript at 355. He was diagnosed with back pain and prescribed medication. The progress notes offer little insight, though, into the work-related limitations caused by his back pain.

Beginning in March of 2014, and continuing through January of 2015, Allen was seen again at St. Bernards on what appears to have been at least five occasions. See Transcript at 447-473. He was seen primarily for his complaints of back pain. The progress notes from the examinations are relevant in one important respect. On November 10, 2014, he underwent MRI testing of his lumbar spine. See Transcript at 453-454. The testing revealed the following abnormalities: "L1-L2 has mild retrolisthesis [and] [b]road-based disc bulging," "L2-L3 has disc space narrowing with slight narrowing of the right foramen," and "L5-S1 has pars defects." See Transcript at 453. The attending physician's concluding impression was as follows: "[c]hronic degenerative changes with no significant canal stenosis or nerve root compression. Bilateral pars defects at L5-S1." See Transcript at 454.

Beginning in April of 2014, and continuing through September of 2014, Allen was seen at the Northeast Arkansas Pain Medicine Clinic and/or The Pain Center for his complaints of back pain. See Transcript at 319-341. At the initial evaluation, Dr. Calvin Savu, M.D., ("Savu") noted, inter alia, that Allen's highest level of education was a high school diploma, he needs the assistance of another person when preparing meals and grocery shopping, but he enjoys "going to the movies, walking, outdoor activities, exercise, reading, and music." See Transcript at 319. Savu noted pain in Allen's lumbar spine and diagnosed lumbar impairments that included lumbar degenerative disc disease. Savu prescribed medication and recommended injection therapy. Savu continued to see Allen for his back pain and noted in September of 2014 that "[t]he treatment provided resulted in significant improvement of pain." See Transcript at 328.

The record contains an undated medical source statement from a Jason Biggs ("Biggs"). See Transcript at 362. In the statement, Biggs represented, inter alia, that Allen can occasionally lift/carry twenty pounds, frequently lift/carry ten pounds, stand/walk for four hours in a typical workday, and sit for an entire workday.

Allen's medical records were reviewed by state agency medical professionals. See Transcript at 53-65, 81-93. With respect to his mental/impairments, the medical professionals agreed that Allen is capable of performing unskilled work, i.e., work where interpersonal contact is incident, the tasks cannot be more complex than those learned and performed by rote with few variables and little judgment, and the supervision required is simple, direct, and concrete.

Allen and his representatives completed a series of documents in connection with his applications. See Transcript at 169-171, 177-178, 245-252, 253-262. In the documents, Allen alleged that he became disabled and unable to work on January 1, 2012. The documents prepared by his representatives contain conflicting representations about the effects of his mental/intellectual impairments. For instance, Brooke Mathes ("Mathes") represented that Allen spends time with others and has no problem getting along with his family, friends, and neighbors. See Transcript at 249-250. Pauline Allen represented, though, that Allen does not spend time with others and has trouble getting along with his family, friends, and neighbors. See Transcript at 259. With respect to Allen's physical abilities, the representatives agreed that Allen can attend to his personal care, prepare simple meals, assist with some house and yard work, and care for his dog.

The record contains a summary of Allen's FICA earnings for the years 1981 through 2013. See Transcript at 201. The summary reflects that he worked sporadically between 1981 and 1997 but had consistent, albeit minimal, earnings from 1998 until 2013.

Allen testified during the administrative hearing. See Transcript at 30-46. He has difficulty lifting more than twenty pounds and can only lift about ten to fifteen pounds for a third of a day before his back begins to hurt. He suffers from borderline intellectual functioning, a multiple personality disorder, mood swings, depression, and post traumatic stress disorder. He attended school for eleven years but only completed the eighth grade. He can read very little and can only read parts of a newspaper; he testified that he "can't understand most of it but some of it I can." See Transcript at 36. He attributed

his difficulty reading to dyslexia. Allen can add, subtract, and even perform multiplication.[3] Although he has a driver's license, he failed the written test twice before passing it and required assistance when he finally did pass it. He can sit for approximately ninety minutes before his back begins to hurt, and he relieves the pain by lying on his back. Allen previously took medication for his mental impairments but stopped taking the medication in 2011. He was hospitalized in 2009 at a psychiatric hospital for his multiple personality disorder.

The ALJ found at step two that Allen's severe impairments include lumbar spondylosis with facet arthropathy, osteoarthritis, borderline intellectual functioning, and depression. The ALJ found at step three that the impairments do not meet or equal a listed impairment, specifically finding, in part, that they do not meet or equal Listings 12.04 and 12.05. The ALJ assessed Allen's residual functional capacity and found that he can perform light work, except that he is limited to the following:

> … lifting and carrying no more than 20 pounds at a time and up to 10 pounds frequently; performing activities that require a good deal of walking or standing as much as six hours in an eight-hour workday; cannot engage in frequent bending or crouching; … mentally he is restricted to unskilled work, meaning he can perform work where interpersonal contact is incidental to the work performed, the complexity of tasks is learned and performed by rote, involves few variables, requires little independent judgment, and the supervision required is simple, direct, and concrete; and cannot deal with the general public.

---

[3] During the administrative hearing, Allen's attorney asked Allen to multiply seven times eight. See Transcript at 37. Allen correctly answered, "fifty-six."

<u>See</u> Transcript at 14. In making the assessment, the ALJ gave great weight to Gibbard's opinions and partial weight to Troxel's findings. The ALJ also gave significant weight to the opinions of the state agency medical professionals about Allen's mental/intellectual impairments but discounted their opinions about his physical abilities.

The record establishes that Allen has mental/intellectual impairments. The ALJ found that the impairments do not meet or equal Listings 12.04 or 12.05 but nevertheless incorporated a limitation for the impairments into the assessment of Allen's residual functional capacity. The ALJ could find as he did because substantial evidence on the record as a whole supports his finding for the reasons set forth below.

I. LISTING 12.04. Allen's mental impairments do not satisfy the requirements of paragraph B of Listing 12.04 for four reasons. First, the ALJ could and did find that Allen has only mild limitations in his activites of daily living. Gibbard recorded Allen's representations that he has no difficulty with his activities of daily living, activities that include driving an automobile, shopping, handling his finances, bathing and dressing, and assisting with household chores. The ALJ could and did credit the findings of the state agency medical professionals who opined that Allen has only a mild restriction in his activities of daily living. <u>See</u> Transcript at 12, 59, 88. The ALJ could and did also credit Mathes' representations contained in a function report she prepared for Allen. In the report, Mathes represented that Allen helps care for his parents, cares for a dog, prepares simple meals, shops, spends time with others, and has no problems getting along with his family, friends, and neighbors.

Second, the ALJ could and did find that Allen has only moderate difficulties in maintaining social functioning. Gibbard observed that Allen's communication skills are within an adequate range, and he appeared to be cooperative during the evaluation. Guile observed that Allen's mood was pleasant and stable, and his communication skills were adequate. The ALJ could and did credit the findings of the state agency medical professionals who opined that Allen has only moderate difficulties maintaining social functioning. See Transcript at 12, 59, 88. The ALJ could and did also credit Mathes' representations that Allen spends time with others and has no problems getting along with his family, friends, and neighbors.

Third, the ALJ could and did find that Allen has only moderate difficulties in maintaining concentration, persistence, or pace. Allen reported being capable of, inter alia, driving an automobile, shopping, and handling his finances. Gibbard opined that Allen has the capacity to cope with mental cognitive work demands, although the demands would need to be relatively simple and routine. Although Gibbard opined that Allen might have problems with the capacity to sustain completion of tasks and completing the tasks in a timely manner, he could do so if the tasks were relatively simple and routine. The ALJ could and did credit the findings of the state agency medical professionals who opined that Allen has only moderate difficulties maintaining concentration, persistence, or pace. See Transcript at 13, 59, 88. The ALJ could and did also credit Mathes' representations that Allen follows written instructions "pretty good" and does not require reminders to care for his personal needs.

Fourth, there is no medical evidence that Allen's mental impairments have caused him to experience repeated episodes of decompensation, which have been of an extended duration. Although he represents, and the Court accepts as true, that he was hospitalized at a psychiatric hospital for his multiple personality disorder, the hospitalization occurred between 2009 and 2010, or approximately two years before the alleged onset date, and there were no other hospitalizations.[4]

There is also no medical evidence that Allen's mental impairments satisfy the requirements of paragraph C of Listing 12.04. Assuming, <u>arguendo</u>, that his mental impairments cause more than a minimal limitation of his ability to do basic work activities, there is no medical evidence of <u>repeated</u> episodes of decompensation, no medical evidence of a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate," and no medical evidence of a history of an inability to function outside a highly supportive living arrangement. The medical evidence instead indicates that the consequence of Allen's mental impairments caused no meaningful periods of decline in, or a downturn of, his condition. He can handle some work stress and change, and he has no history of an inability to function outside of a high supportive living arrangement.

---

[4] Assuming that the hospitalization was close enough to the alleged onset date to be relevant, it appears to be the only such episode of extended decompensation. Moreover, Listing 12.04 requires Allen to show at least two of the paragraph B criteria. Assuming he can meet the "repeated episodes of decompensation" requirement, he cannot meet any of the other three criteria.

II. LISTING 12.05. Allen's intellectual impairments do not satisfy the requirements of paragraph B of Listing 12.05 for several reasons. First, Allen has produced little evidence of his "significantly subaverage general intellectual functioning" prior to his twenty-second birthday.[5] The evidence of his general intellectual functioning was confined to his self-reports to his attending medical professionals and his testimony during the administrative hearing.[6] He represented that he attended school for eleven years but only completed the eighth grade. He also represented that he can only read at a sixth grade level. His representations do not establish or support onset of an intellectual disability before his twenty-second birthday. It is worth noting that despite having only a limited education, he can add, subtract, and perform multiplication.

Second, Allen has failed to show that his "deficits in adaptive functioning" began to manifest prior to his twenty-second birthday.[7] With respect to his Allen's daily activities, the ALJ could and did find that Allen is capable of, inter alia, caring for himself, helping his parents, performing some household chores, and shopping. With

---

[5] In Foster v. Halter, 279 F.3d 348 (6th Cir. 2001), the United States Court of Appeals for the Sixth Circuit Court "split up its analysis of the 'significantly subaverage general intellectual functioning' and the 'deficits in adaptive functioning' parts of the test." See McMillan v. Commissioner of Social Security, 2012 WL 90264 at 3 (W.D.Mich. 2012). The Court does likewise.

[6] Allen has not produced any school records to support his assertion of significantly subaverage general intellectual functioning prior to his twenty-second birthday.

[7] The introductory paragraph of Listing 12.05 does not define "deficits in adaptive functioning." It does, though, provide "criteria for assessing the 'severity' required by [paragraph C] of some other mental impairments and by [paragraph D] of Listing 12.05." See Durden v. Astrue, 586 F.Supp.2d 828, 834 (S.D.Tex. 2008). These criteria include matters such as adaptive activities of daily living, social functioning, and concentration, persistence, or pace. See Id.

respect to Allen's social functioning, the ALJ could and did find that Allen spends time with others and has no problem getting along with his family, friends, and neighbors. With respect to Allen's concentration, persistence, or pace, the ALJ could and did find that Allen has only moderate difficulties.

Third, Allen cannot satisfy the requirements of any of the four paragraphs contained in Listing 12.05. Paragraph A of the listing requires the showing of a mental incapacity evidenced by dependence upon others for personal needs and an inability to follow directions. Allen did not make such a showing. He can attend to his personal needs, and he appears capable of following written directions. Paragraphs B, C, and D require, in part, evidence of a valid verbal, performance, or full scale IQ below a certain level. The record contains no IQ testing of Allen.

Allen faults the ALJ for failing to obtain IQ testing. As the Commissioner correctly notes, though, Allen bears the burden at step three, and it is his responsibility to produce medical evidence, including IQ testing, meeting the burden. He offered no such evidence. The Court is not persuaded that the ALJ should have obtained IQ testing of Allen. The record contains adequate evidence for the ALJ to have properly evaluated Allen's claim. See Haley v. Massanari, 258 F.3d 742 (8th Cir. 2001) (ALJ may issue decision without obtaining additional medical evidence when other evidence is adequate).[8]

---

[8] Allen also makes passing assertions that the ALJ erred at step three when he failed to find that Allen's impairments meet or equal Listings 1.04 and 12.06. See Document 13 at CM/ECF 10, 11, 13. Because Allen provides no meaningful analysis of the relevant law or facts regarding those listing, his assertions will not be considered. See Vandenboom v. Barnhart, 421 F.3d 745 (8th Cir. 2005).

The record also establishes that Allen has pain caused by a back impairment, an impairment identified by the ALJ as lumbar spondylosis with facet arthropathy. The ALJ evaluated the medical evidence, as well as the non-medical evidence as required by Polaski v. Heckler. The ALJ incorporated the limitations caused by Allen's back impairment and credible complaints of pain into the assessment of his residual functional capacity but could and did find that some of his complaints were not fully credible. The ALJ could so find as substantial evidence on the record as a whole supports his finding for the reasons set forth below.

First, the ALJ adequately considered the medical evidence relevant to Allen's back impairment. The ALJ could and did properly give partial weight to Troxel's opinions regarding the extent of Allen's limitations, specifically, Troxel's opinions that Allen's range of motion was within normal limits, he had negative straight-leg raises, and his gait and coordination were within normal limits. The ALJ could also give some weight to Troxel's opinion that Allen had no significantly decreased ability to, inter alia, walk, stand, sit, lift, or carry. The ALJ could and did, though, properly discount Troxel's opinions because they pre-dated Allen's November of 2014 MRI. The ALJ properly considered the results of the MRI which showed that Allen has chronic degenerative changes in his lower back but no significant canal stenosis or nerve root compression. The pain caused by those changes was significantly improved, though, by the treatment Allen received from Savu throughout most of 2014, treatment that included medial branch blocks.

Second, although the ALJ's evaluation of the non-medical evidence was not exhaustive, it was adequate. Allen's daily activities are no more than mildly limited, and the duration, frequency, and intensity of his pain do not prevent him from, as Savu observed, walking, engaging in outdoor activities, and exercising. Although Allen has received medial branch blocks, his use of medication is otherwise minimal. His work history is not particularly impressive, and it is worth noting that Troxel believed that Allen was malingering.

"The ALJ is in the best position to gauge the credibility of testimony and is granted deference in that regard." See Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). In this instance, the Court finds that Allen has not offered a legitimate reason for deviating from the aforementioned rule. The evaluation of his credibility is one of the acceptable evaluations of the evidence.[9]

On the basis of the foregoing, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings. Allen's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 1st day of March, 2017.



UNITED STATES MAGISTRATE JUDGE

---

[9] Allen also appears to challenge the hypothetical questions posed by the ALJ to the vocational expert. Because Allen provides no meaningful analysis of the relevant law or facts regarding the assertion, it will not be considered. See Vandenboom v. Barnhart, 421 F.3d 745 (8th Cir. 2005).